**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NORTHEAST METAL TRADERS, INC., et al.,** | **Case No. 2:19-cv-01546-JDW** |
| *Plaintiffs,* | |
| v. | |
| **TAV HOLDINGS, INC., et al.,** | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

This case poses the familiar question of when parties to a business relationship can assert tort claims, rather than just claims arising from their contract. Defendants think this is such a case and have asserted counterclaims sounding in both contract and tort. To no one's surprise, Plaintiffs disagree and move to dismiss the tort claims. The Court agrees with Plaintiffs that there is no basis for the counterclaims sounding in tort. It will therefore grant the Motion.

## I.    BACKGROUND

### A.    Facts

TAV Holdings, Inc. and Joseph Smith & Sons, Inc. ("JS&S" and, together with TAV, "Sellers") sell scrap metal. TAV is a Georgia-based entity, and JS&S is a Delaware corporation with a scrap metal processing facility in Maryland. NorthEast Metal Traders, Inc. ("NEMT") and Wallach Trading Co., Inc. are buyers and sellers of scrap metal. (The Court will refer to NEMT and Wallach collectively as "Brokers.") In 2016, Sellers entered into an agreement with Brokers to have Brokers use their contacts with Aurubis AG Recyclingzentum to broker the sale of scrap

metal to Aurubis. Pursuant to the agreement, Brokers served as a conduit for Sellers: scrap metal moved from Sellers through Brokers to Aurubis.

Money flowed the other way. Aurubis made an interim payment, or "advance," for each load of scrap metal it received. It estimated the copper that it would recover from the load and calculated the advance on that basis. Aurubis paid the advance to Brokers, who forwarded it to Sellers. The final purchase price for each scrap metal load depended on the weight and composition of metals recovered from each load. That is, once Aurubis received a shipment of scrap metal, it would weigh it and analyze the metal content, known as an assay. Aurubis then calculated the final purchase price for each recovered metal, based on its weight, the assay results, and the market price. For each scrap metal shipment, Aurubis provided Brokers the assay results, a final settlement statement showing the purchase price for all recovered metals, and any additional payment due above the advance. According to the Parties' agreement, Brokers received a brokerage fee of $0.015 per pound of scrap metal that Aurubis received, regardless of what Aurubis recovered from the shipment.

For each scrap metal shipment, NEMT sent Sellers a reconciliation statement showing the actual recovered metal weight and assay results received from Aurubis. NEMT then calculated a purchase price and compared it to the prior estimated advance in order to determine the final payment amount due. The Parties agreed that NEMT would include Aurubis' assay results and final settlement statements with each reconciliation statement. But Sellers claim they did not get those documents, even though they asked for them throughout 2017 and 2018. Sellers also assert that when Brokers finally provided a limited subset of the documents, the documents revealed that Brokers had understated the amount of copper and precious metal contents in the scrap metal loads. Thus, according to Sellers, Brokers were pocketing the difference between the advance payment

and final purchase price when scrap metal loads contained precious metal contents in excess of Aurubis's preliminary estimates. Sellers also allege that Brokers charged commissions of $0.030 per pound, double the amount to which they had agreed.

### B.    Procedural History

On March 6, 2019, Brokers filed suit in Pennsylvania state court against Sellers, alleging that Sellers violated the Parties' agreement by failing to ship 8 million pounds of copper. Sellers removed the case to federal court on April 11, 2019. On December 4, 2019, Sellers filed an Amended Answer with multiple counterclaims, including breach of contract (Counts I & II), breach of fiduciary duty (Count III), aiding and abetting breach of fiduciary duty (Count IV), misappropriation and conversion (Count V), and civil conspiracy (Count VI). On January 2, 2020, Brokers filed this motion to dismiss Counts III-VI.

## II.    LEGAL STANDARD

A district court may dismiss a plaintiff's complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Rather than require detailed pleadings, the "Rules demand only a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quotation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (same). A claim has facial plausibility when the complaint contains factual allegations that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (same). In doing so, the court must "draw on its judicial experience and common sense." *Id.* (same). Under the governing "pleading regime[,]" a court confronted with a 12(b)(6) motion must take three steps. First, it must identify the elements needed to set forth a particular claim. *Id.* at 878 (same). Second, the should

identify conclusory allegations, such as legal conclusions, that are not entitled to the presumption of truth. *Id.* (same). Third, with respect to well-pleaded factual allegations, the court should accept those allegations as true and "determine whether they plausibly give rise to an entitlement to relief." *Id.* (same). The court must "construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Id.* at 790 (citations omitted).

## III.    ANALYSIS

### A.    Choice Of Law

The Parties contest which state law governs the dispute. Brokers argue that Pennsylvania law applies, while Sellers argue for Missouri law. There is no conflict between Pennsylvania and Missouri law. Thus, the Court need not conduct a choice of law analysis. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) ("If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary"). Sellers also reference Georgia and Maryland law, but no one argues that either of those state's laws applies. The Court therefore has not considered them.

### B.    Fiduciary Duty

To plead a claim for breach of fiduciary duty, the claimant must first prove the existence of a fiduciary relationship. *See Reginella Const. Co. v. Travelers Cas. & Sur. Co. of Am.*, 949 F. Supp.2d 599, 611 (W.D. Pa. 2013) (citing *In re Estate of Clark*, 359 A.2d 777, 781 (1976) and *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 414 (E.D. Pa. 2006)); *see also Int'l Envtl. Mgmt., Inc. v. United Corp. Servs., Inc.*, 858 F.3d 1121, 1125 (8th Cir. 2017) (Missouri law). "When a person authorizes another to act as his agent, the relationship between the two may be characterized as a fiduciary relationship." *McDermott v. Party City Corp.*, 11 F. Supp.2d 612, 626 (E.D. Pa. 1998); *see also Int'l Envtl. Mgmt,* 858 F.3d at 1125. Agency has three basic elements:

the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking, and the understanding of the parties that the principal is to be in control of the undertaking. *See Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000) (citation omitted); *State ex rel. Ford Motor Co. v. Bacon*, 63 S.W.3d 641, 642 (Mo. 2002). "The key and distinctive feature of an agency relationship is the agent's power to affect the legal relationship of the principal with third parties: e.g., entering into contracts for them, buying or selling goods for them, or subjecting the principal to potential tort liability." *Wisniski v. Brown & Brown Ins. Co. of PA*, 906 A.2d 571, 577 (Pa. Super Ct. 2006) (citation omitted). "The burden of establishing an agency relationship rests with the party asserting the relationship." *Basile*, 761 A.2d at 1120 (citation omitted); *see John Doe CS v. Capuchin Franciscan Friars*, 520 F. Supp. 2d 1124, 1132 (E.D. Mo. 2007).

The Parties' agreement did not create a fiduciary obligation here. Sellers contend that Brokers' role as brokers is *per se* sufficient to establish a fiduciary relationship. It is not. Indeed, the Pennsylvania Superior Court has made clear that "for the great majority of broker-client interactions, the relationship will not be so extremely one-sided as to be confidential." *Wisniski v. Brown & Brown Ins. Co. of PA*, 906 A.2d 571, 579 (Pa. Super. Ct. 2006). Instead, the question of whether a fiduciary relationship exists between the parties is fact specific. *Id*. at 578.

Here, Brokers transferred Sellers' scrap metal to Aurubis and then remitted payments from Aurubis to Sellers, minus a commission. Aurubis, in turn, analyzed the metal contents of the scrap metal and determined the purchase price that it owed. Nothing before the Court suggests that Brokers had the power to alter legal relations between Sellers and Aurubis. Brokers could not legally bind Sellers, nor could they negotiate prices on Sellers' behalf. Sellers' contention that Brokers "had total control and exclusive knowledge of and control over all relevant dealings with

Aurubis" is not accurate. (ECF No. 38 ¶ 35.) In fact, Sellers admit that the "[P]arties agreed that NEMT would include [Aurubis' assay results and final settlement statements] with each reconciliation statement provided to [Sellers]." (*Id.* ¶ 14.) In other words, Sellers expected Brokers to inform them about each transaction and only relied on Brokers to act as a conduit to Aurubis. It does not matter that Brokers allegedly refused to provide Aurubis' assay results and settlement statements; agency "results **only if there is an agreement** for the creation of a fiduciary relationship with control by the beneficiary." *eToll, Inc. v. Elias/Savion Advert., Inc*., 811 A.2d 10, 21 (2002). Here, there was not. The Parties' relationship was an arms-length transaction that did not give rise to a fiduciary relationship. Thus, the Court will dismiss Counts III and IV of Defendants' counterclaims.

### C.    Gist Of The Action Doctrine

The gist of the action doctrine "prevents a party from bringing 'a tort claim for what is, in actuality, a claim for breach of contract.'" *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, 870 F.3d 244, 256 (3d Cir. 2017) (quoting *Bruno v. Erie Ins. Co*., 106 A.3d 48, 60 (Pa. 2014)); *Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies. Inc*., 332 S.W.3d 184, 192 (Mo. App. S.D. 2010) ("The economic loss doctrine prohibits a plaintiff from seeking to recover in tort for economic losses that are contractual in nature.") "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract." *Bruno*, 106 A.3d at 68. On the other hand, if the "facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort." *Id*.

"Where a tortious claim for conversion is based solely on the failure to perform under a contract, it is barred by the gist of the action doctrine." *Vives v. Rodriguez*, 849 F. Supp. 2d 507, 516–17 (E.D. Pa. 2012); *see also Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. Ct. 2003). Here, Sellers' conversion claim arises out of their agreement with Brokers. Indeed, Sellers concede that their claim for conversion is based on the fact that Brokers retained "portions of sale proceeds above the $0.015 per pound commission provided for in the contract." (ECF No. 43 at 15.) Sellers contend that the gist of the action doctrine does not apply where, as here, the party has a property interest in the thing that is the subject of a conversion claim. But Sellers do not have a property interest in the proceeds from the sale of the scrap metal that is independent of the contract between the Parties. By Sellers' own admission, "**payments** . . . which the party is only entitled to receive by virtue of the contract" fall within the gist of the action doctrine. (*Id*. at 14.) To hold otherwise would mean that every breach of contract for the payment of goods would also give rise to a claim for conversion. Thus, the Court will dismiss Count V of Sellers' counterclaim.

### D. Civil Conspiracy

A cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability. *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999). Accordingly, because the Court will dismiss Sellers' tort claims, their claim for civil conspiracy must also fail.

## IV. CONCLUSION

Sellers' real dispute with Brokers is a contractual dispute. They cannot repackage that dispute into a tort claim. Therefore, the Court will grant the Motion and dismiss Counts III-VI in the Sellers' counterclaim. An appropriate Order follows.

BY THE COURT:

_/s/ Joshua D. Wolson_
JOSHUA D. WOLSON, J.

Dated:  March 16, 2020